1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF NEW YORK

3

4   JOY PRUE,                          )
                                       )
5                                      )
            Plaintiff,                 )    CASE NO. 13-CV-1280
6                                      )
        vs.                            )
7                                      )
    HUDSON FALLS POST NO. 574,         )
8   The American Legion, Department    )
    of New York,                       )
9                                      )
                                       )
10           Defendant.                )
                                       )
11   _____)

12

13              **TRANSCRIPT OF PROCEEDINGS**
          **BEFORE THE HON. FREDERICK J. SCULLIN, JR.**
14                **FRIDAY, MAY 27, 2016**
                  **ALBANY, NEW YORK**

15

16   **FOR THE PLAINTIFF:**
          Morgado, PA
17        By:  Dale J. Morgado, Esq.
          600 Third Avenue, 2nd Floor
18        New York, New York  10016

19

20   **FOR THE DEFENDANT:**
          Office of Charles G. Mills, Esq.
21        By:  Charles G. Mills, Esq.
          56 School Street
22        Glen Cove, New York  11542

23

24          **THERESA J. CASAL, RPR, CRR, CSR**
          Federal Official Court Reporter
25          445 Broadway, Room 509
          Albany, New York  12207

          *THERESA J. CASAL, RPR, CRR*
      *UNITED STATES DISTRICT COURT – NDNY*

1              **I N D E X    T O    W I T N E S S E S**

2

3  PLAINTIFF:              <u>DIRECT</u>   <u>CROSS</u>   <u>REDIRECT</u>   <u>RECROSS</u>

4  Joy L. Prue               6        12        ---        ---

5                        - - - - -

6

7  <u>DEFENDANT</u>:

8  Daniel M. Nolin          18        20        ---        ---

9  Robert J. Beard          23        25        ---        ---

10  Basil F. Touart, Jr.     29        30        ---        ---

11  Mary E. Gebo             35        36         45        ---

12  Robert F. Cheeney, Sr.   47        48        ---        ---

13  Margaret M. Folk         51        52        ---        ---

14  Chris A. Fontaine, Jr.   55        57        ---        ---

15                        - - - - -

16

17

18

19

20

21

22

23

24

25

*Prue v. Hudson Falls Post No. 574*

1                    (Court commenced at 2:09 PM.)

2              THE CLERK:  Today is Friday, May 27, 2016, the

3    time is 2:10 PM.  The case is Joy Prue versus Hudson Falls

4    Post No. 574, The American Legion, Department of New York,

5    case number 13-CV-1280.  We are here today for a motion

6    hearing on damages.  May we have appearances for the record,

7    please?

8              MR. MORGADO:  Good afternoon, your Honor.  Dale

9    Morgado for the plaintiff.

10             THE COURT:  Mr. Morgado.  And who is with you at

11   counsel table?

12             MR. MORGADO:  Vincent Boczanowski from my office

13   and my client, Joy Prue.

14             THE COURT:  I am sorry, I can't hear you.

15             MR. MORGADO:  From my office, Vincent Boczanowski,

16   and my client, Miss Prue.

17             THE COURT:  Miss Prue.  Will you be doing the

18   examination and cross-examination?

19             MR. MORGADO:  I will be doing everything, your

20   Honor.

21             THE COURT:  All right.  Thank you.

22             MR. MILLS:  Charles G. Mills, of Glen Cove, for

23   the defendant.  And I have the original co-defendant with me

24   at counsel table.  The present Commander of the defendant is

25   out in the room here somewhere.

*Prue v. Hudson Falls Post No. 574*

1            THE COURT:  Your name, sir.

2            MR. FONTAINE:  Chris Fontaine.

3            THE COURT:  Chris Fontaine.  All right.  And you

4   represent Hudson Falls Post 574, is that correct?

5            MR. MILLS:  Yes, your Honor.

6            THE COURT:  I'm talkin' to him.

7            MR. FONTAINE:  Yes.

8            THE COURT:  All right.  Thank you.  You may be

9   seated.  Let's wait until we see what we have here.  We are

10  starting a little bit late, we haven't got much time today,

11  it's a little late on Friday afternoon, so we will try to

12  move this right along.

13           For the record, we have to resolve the final issue

14  here in this case as I understand it, and that is the

15  damages as to a certain amount of overtime that's alleged to

16  have been spent by the plaintiff here and never compensated

17  for.  And that's for a set period of time, between April 17,

18  2011, to April 2012.  The Court needs to determine the

19  number of hours that were worked, that the plaintiff worked

20  as house manager for each week during that period of time.

21  Is that correct, gentlemen?

22           MR. MORGADO:  Yes, I believe so, your Honor.

23           THE COURT:  That's correct?

24           MR. MILLS:  Yes, your Honor.

25           THE COURT:  All right, thank you.  All right.  So

*Prue v. Hudson Falls Post No. 574*

1    the plaintiff has indicated they have witnesses to testify.

2    Miss Prue and is it Chris Fontaine, is that correct, as

3    well?

4              MR. MORGADO:  We reserve the right to call

5    Mr. Fontaine.

6              THE COURT:  I'm sorry?

7              MR. MORGADO:  We don't anticipate calling

8    Mr. Fontaine.

9              THE COURT:  So Miss Prue is your only witness?

10             MR. MORGADO:  Correct, your Honor.

11             THE COURT:  All right.  You wish to proceed and

12   put Miss Prue on the stand?

13             MR. MORGADO:  Yes, your Honor.

14             THE CLERK:  If you could please step forward,

15   Miss Prue.  Would you please raise your right hand and state

16   your full name for the record, please.

17             THE WITNESS:  Joy Lynn Prue.

18             THE CLERK:  Would you please spell your name for

19   the court reporter?

20             THE WITNESS:  P as in Peter, R as in Robert, U as

21   in uncle, E as in Edward.

22             THE CLERK:  Thank you.

23             THE WITNESS:  You're welcome.

24                    (Witness duly sworn.)

25             THE COURT:  Mr. Morgado, use the full podium,

*Prue – Direct*

1   please, that way I can hear you when you speak into the

2   microphone.  Are you ready to proceed?

3           MR. MORGADO:  Ready, your Honor.

4           THE COURT:  All right.  You may do so.

5                   **J O Y    L.    P R U E,**

6   having been duly sworn by the Clerk of the Court, was

7   examined and testified as follows:

8   **DIRECT EXAMINATION BY MR. MORGADO:**

9   Q   Good afternoon, Miss Prue, how are you?

10  A   Nervous, but glad that I'm alive to be here today.

11  Q   The Court is familiar, you've had some medical issues

12  recently.  Is there anything today, any medical concern or

13  issue that would prevent you from testifying accurately and

14  truthfully?

15  A   No.

16  Q   Okay.  Are you currently taking any medication that

17  would prevent you or affect your ability to testify

18  truthfully?

19  A   No.  I didn't take any pain pills so I would be alert

20  and not sleeping.

21  Q   We are running a little bit behind on time, but I did

22  want you to tell the Court a little bit about who you are

23  and your background.  Could you just tell Your Honor a

24  little bit about yourself, please?

25  A   I was born in South Glens Falls, New York, traveled all

*Prue — Direct*

1    over 'cause my father was a Navy man.  Quit school in tenth

2    grade so I could go in the Air Force.  Got out, had two

3    children, went to school, got my Bachelor's Degree, and now

4    I'm basically kinda livin' day by day.  I have a lot of

5    medical issues still going on, so...

6    Q    Do you know the purpose of today's hearing?

7    A    I do.

8    Q    And what --

9    A    I read the Court papers and I'm just here to show the

10   hours that I worked during April of 2011 and April of 2012.

11   Q    Okay.  What corporation, if any, did you work for last?

12   A    American Legion.

13   Q    And when did you start working for the American Legion?

14   A    April 27, 2011.

15   Q    Did you -- did there come a time where you stopped

16   working for the Legion?

17   A    November 14, 2012.

18   Q    Do you know a Chris Fontaine?

19   A    I do.

20   Q    Who is he?

21   A    He was one of the employees out of 12 on the Executive

22   Board -- employer, sorry.

23   Q    Focusing on the relevant time period here, and when I

24   say that I mean April 2011 to April 2012, did you have an

25   official position with the Legion?

*Prue — Direct*

1  A    I did.  The house manager.  I was also the adjutant for

2  the legionnaires.

3  Q    And as your house manager position goes, what were your

4  general duties?

5  A    Basically, I went -- I supervised the bartenders, the

6  janitor staff, opened the bar, did inventories, stocking,

7  bartended when needed, oversaw the events.  That's

8  basically --

9  Q    Okay.

10  A    And did all the bank reconciliations for the registers

11  and the lounge.

12  Q    You mentioned another job, adjutant, is that correct?

13  A    Correct.

14  Q    Okay.  What were your job duties for that job?

15  A    I took minutes at the meetings and then typed 'em up,

16  made copies ready for the next month's meeting, and

17  correspondence, if need be.

18  Q    Do you understand what your lawsuit is about,

19  Miss Prue?

20  A    I do.

21  Q    And what is it?

22  A    I'm basically just looking at the overtime pay that I

23  wasn't given during the time frame that I worked.

24  Q    Are you claiming and seeking from this Court overtime

25  pay for your hours that you worked both as an adjutant and

*Prue – Direct*

1   as a house manager?

2   A    No.

3   Q    Okay.  Could you tell the Court what you are, what

4   position, if any, you are seeking?

5   A    Just the house manager.

6   Q    Do you recall how many hours per week on average you

7   spent as an adjutant working?

8   A    One to two hours a week.

9   Q    And again, just -- unless I say otherwise, I'm talking

10  about the relevant time period, April 2011 to April 2012, do

11  you understand that?

12  A    Yes.

13  Q    Okay.  And so your estimate of one to two hours for

14  work as an adjutant, that was during this relevant time

15  period?

16  A    Yes.

17  Q    Okay.  And what about as your job as a house manager,

18  do you recall approximately how many, on average, hours you

19  would work per week?

20  A    Approximately 55 hours.

21  Q    And again, just to confirm, this is during the relevant

22  time period I'm discussing today with you?

23  A    Yes.

24  Q    Okay.  And how did you come up with the average of 55

25  hours per week?

*Prue – Direct*

1  A     I based it on my normal daily schedule or routine.

2  Q     And what was your normal daily scheduled routine that

3  led you to this estimate?

4  A     In the morning, I would balance out or reconcile the

5  cash from the registers, from the day before, count the

6  change, put the deposit slips together, go to the bank, make

7  the deposit, do an inventory on the liquor room, on the beer

8  cooler, the regular cooler, for juices, milk, things like

9  that, and then any miscellaneous supplies, cups, napkins,

10  straws that were needed for the bar.  I also went shopping

11  for the supplies, Louis' Market (phonetic) to pick up fruit,

12  if we needed fruit, or milk or whatever the case may be.  I

13  was also supposed to be available to handle the events that

14  came in.  I met with the clients, showed them the building,

15  went over the contracts, got the deposits.  If there was a

16  special event that was unplanned, for instance a funeral, I

17  went in and opened for the color guard to come in and then

18  stayed 'til they got back and the regular bartender came on

19  duty.

20  Q     Anything else?

21  A     No.

22  Q     And for the -- and are these -- excluding the events

23  that would come, you didn't have an event every single day,

24  did you?

25  A     Not every single day.  Generally once a week, sometimes

1    two or three.

2    Q    Putting aside any events that you would perform work

3    for during a work week, the other duties that you mentioned,

4    the cash, balancing, registry reporting, the bank runs, the

5    inventory and the shopping, et cetera, did you come up with

6    an estimate as to what your daily schedule for those duties

7    took each day, on average?

8    A    About ten hours a day, normally, and then -- and that's

9    disregarding the events.

10   Q    Understood.  Did ya keep any records of your hours

11   during this time period that we're talking about, the

12   April 2011 to April 2012?

13   A    No.

14   Q    Did ya -- during any time that you worked for the

15   Legion, did you keep any time records?

16   A    Yes.

17   Q    Okay.  And for the time periods that you did take

18   records for, as to the hours you worked, do you recall what

19   the average or so hours came out to be per week?

20   A    I believe it was about 55 hours, 50 to 55 hours.

21   Q    Did your work change, as far as duties were concerned,

22   between -- after April 2012?

23   A    No.

24   Q    Did ya have the same general daily schedule that ya had

25   post April 2012 as you were doing, you know, pre April 2012?

*Prue – Cross*

1   A     Yes.

2   Q     Did you ever perform any jobs or provide any services

3   that were not for the Legion but while on duty at the

4   Legion?

5   A     No.

6   Q     Did ya ever tutor any students while you were at the

7   Legion?

8   A     No.

9   Q     Did ya do any travel agent type duties while you were

10  working at the Legion at any time?

11  A     No.

12  Q     Okay.

13        MR. MORGADO:  Your Honor, I don't have any further

14  questions for this witness.

15        THE COURT:  All right.  Thank you.  All right.

16  You may proceed.

17  **CROSS-EXAMINATION BY MR. MILLS:**

18  Q     How did you estimate these ten hours per day?

19        THE COURT:  I'm sorry, I can't hear the question.

20  Q     How did you estimate these ten hours per day?

21  A     By knowing the jobs that I did and how long it took to

22  do 'em.

23  Q     Did you do this based on when you got -- when you

24  started and when you finished?

25  A     Correct.

*THERESA J. CASAL, RPR, CRR*
*UNITED STATES DISTRICT COURT – NDNY*

*Prue - Cross*

1    Q    What?

2    A    Yes.

3    Q    Okay.  Now, there was an event once a week called

4    picking and grinning, right?

5    A    Correct.

6    Q    You played the guitar during that event?

7    A    Only when I wasn't in the kitchen.

8    Q    Okay.  Did you count that time when you were playing

9    the guitar in your ten hours?

10   A    No, I did not.

11   Q    Okay.  You had a table in the corner of the building

12   where you did travel agency work, didn't you?

13   A    No, I did not.

14   Q    Did you have a table in the corner of the building?

15   A    No, I did not.

16   Q    Okay.  Now, you say there came a time when you kept

17   records of your time?

18   A    Correct.

19   Q    What were these records like?  Describe them.

20   A    It was a time card.

21   Q    You filled a time card?

22   A    The Executive Board started requiring in April of 2012.

23   Q    You filled a time card out?

24   A    Yes, I did.

25   Q    From your own memory of what your hours were during the

*Prue – Cross*

1  week?

2  A    When I got there, I wrote the time I got there, when I

3  left, I wrote the time that I left.

4  Q    Did you eat lunch?

5  A    No.

6  Q    Never ate lunch.  Did you -- when you -- when you were

7  playing the guitar at picking and spinning, did you exclude

8  the time from the time you got there until the time you

9  left?

10 A    I did.

11 Q    You said you read the Court papers in this case?

12 A    Correct.

13 Q    Did you sue Mr. Fontaine?

14 A    Yes.

15 Q    Did you allege that he was the Commander who hired you?

16 A    No, I did not.

17 Q    Did the papers you read allege that?

18 A    No.

19 Q    The complaint in this case does not allege he was the

20 Commander when you were hired?

21 A    No, it does not.

22 Q    Did you make a complaint to the New York State Division

23 of Labor?

24 A    I did.  I applied for unemployment.

25 Q    And did that complaint result in a finding that some of

*Prue – Cross*

1   your co-employees were not paid for overtime but not that

2   you were not paid for overtime?

3   A    Not that I'm aware of.  I was denied, until I sent them

4   other documents, but I don't know about anybody else.

5   Q    Well, did the Department of Labor ever rule in your

6   favor?

7   A    No.  At that point in time, I got an attorney, so I

8   didn't ever go back to them.

9                        (Pause in proceedings.)

10  BY MR. MILLS:

11  Q    Who was the Commander when you were hired?

12  A    Larry Pratt.

13  Q    Did you do any online studying for a degree while you

14  were at the Post?

15  A    No, I did not.

16  Q    You were a member of the American Legion Riders,

17  weren't you?

18  A    Yes, I was.

19  Q    Did you exclude the time you were attending their

20  meetings from those hours you're claiming?

21  A    I did.

22                       (Pause in proceedings.)

23  BY MR. MILLS:

24  Q    You called the numbers at the Bingo games, didn't you?

25  A    No, I did not.

*Prue — Cross*

1    Q    Did you play Bingo?

2    A    Yes.

3    Q    Did you exclude the Bingo time from the hours that

4    you're claiming?

5    A    Yes.

6                        (Pause in proceedings.)

7    BY MR. MILLS:

8    Q    So, despite the fact that you spent five hours a month

9    on picking and grinning, and maybe an hour, hour-and-a-half

10   on Post meetings and an hour, an hour-and-a-half on

11   Executive Board meetings, and the time for the other things

12   we just mentioned, you still say you worked ten hours a day?

13   A    Yes.

14             MR. MORGADO:  Object.

15             THE COURT:  First of all, sustained as to the form

16   of the question.  Please, break it down.

17             MR. MILLS:  Well, I think she's already answered

18   the question, so I'm satisfied.

19             THE COURT:  Not as far as I'm concerned.

20             MR. MILLS:  I'll withdraw the question, your

21   Honor.

22             THE COURT:  Strike the question and the answer

23   from the record, please.

24   BY MR. MILLS:

25   Q    Okay, despite the hours you spent on picking and

*Prue - Cross*

1   spinning, did you still have ten hours working a day?

2   A    I did.

3   Q    Despite the hour, hour-and-a-half you spent on the

4   Executive Board meeting, did you still have ten hours a day?

5   A    I did.

6   Q    Despite the ten or ten-and-a-half hours you spent on

7   Post meetings, you still had ten hours a day, is that

8   correct?

9   A    That is correct.

10  Q    And despite the other things that you did at the Post,

11  you still had ten hours a day working?

12  A    I did.

13  Q    Did it take ten hours a day to do that job?

14  A    Yes, it did.

15           MR. MILLS:  No further questions, your Honor.

16           THE COURT:  All right.  Redirect?

17           MR. MORGADO:  No redirect, your Honor.  Plaintiffs

18  would rest their case at this time.

19           THE COURT:  You rest your case?  I'm sorry, did

20  you say you rest your case?

21           MR. MORGADO:  Yes, plaintiff rests their case.

22                  (Witness was excused.)

23           THE COURT:  All right.  Defense.

24           MR. MILLS:  Yes, your Honor, I would like to call

25  Mr. Dan Noland, N-O-L-A-N-D (sic).

*Nolin - Direct*

1          THE CLERK:  Sir, would you please step forward.

2    Would you please raise your right hand and state your full

3    name for the record, please.

4          THE WITNESS:  Daniel M. Nolin, N-O-L-I-N.

5          **D A N I E L    M.    N O L I N**,

6    having been duly sworn by the Clerk of the Court, was

7    examined and testified as follows:

8    **DIRECT EXAMINATION BY MR. MILLS:**

9    BY MR. MILLS:

10   Q    Mr. Nolin, do you have any relationship to the Post?

11   A    I'm an employee at the Post, and a volunteer.

12   Q    Okay.  Taking the employee situation, first, what's

13   your employment with the Post?

14   A    I'm a bartender.

15   Q    And how much are you paid?

16   A    $9 per hour.

17   Q    Okay.  And what is your -- what else do you do for the

18   Post for which you're not paid?

19   A    I volunteer many hours a week to do cookin', I used to

20   help clean.  I've done cleaning around there, I've taken

21   care of our pavilion, winterization and cleaning over the

22   years since it was built.  Many other things I volunteer for

23   at the Legion.  Anything you can think of as a volunteer

24   job, I do it.

25   Q    Okay.  Did you observe the plaintiff when you were a

*Nolin – Direct*

1  bartender?

2  A    Yes.

3  Q    Did you observe how often she was there on the day you

4  were the bartender?

5  A    Well, certainly, when I was there, I observed when she

6  was there and when she wasn't there.

7  Q    Would you just explain a little bit by what you mean by

8  when she was there and when she was not there?

9  A    Well, I come to work normally at 12:30 in the afternoon

10 to prepare for my shift that starts at 1:00 and is usually

11 over 10:00, 10:30 in the evening.  Some days she would be

12 there when I come in, some days she wouldn't be.  Generally,

13 after I got to work, most days she would leave because, ya

14 know, the Legion would be basically under my control until

15 the end of the shift unless I needed her or somebody else to

16 assist me with anything.

17 Q    Who was responsible for receiving shipments to the

18 Legion?

19 A    Typically, the house manager or the bartender on duty.

20 Q    Did you receive shipments?

21 A    Most definitely.

22 Q    About what portion of 'em did you receive?

23 A    Generally, one or two liquor deliveries a week and

24 sometimes, ya know, one or two beer deliveries, just

25 depended week to week what time they came.

*Nolin - Cross*

1   Q     And was the plaintiff there when you would receive

2   these deliveries?

3   A     When I received 'em, no.

4   Q     Is that why you received 'em?

5   A     Yeah.

6              MR. MILLS:  Okay, your witness.

7              THE COURT:  Pardon me?

8              MR. MORGADO:  May I proceed, your Honor?

9              THE COURT:  I beg your pardon?

10             MR. MORGADO:  May I proceed?

11             THE COURT:  Yes.

12  **CROSS-EXAMINATION BY MR. MORGADO:**

13  Q     Good afternoon, Mr. Nolin.

14  A     Good afternoon.

15  Q     Do folks familiar with you call you Big Dan?

16  A     Yep.

17  Q     And is it your testimony that you know when Miss Prue

18  worked, what time she started and what time she ended?

19  A     On some days when she would leave after I got to work,

20  I knew what time she was leavin'.  I don't know what time

21  she got to work, ya know.

22  Q     So, is it fair to say that there are times when you

23  don't know whether she's working or not working?

24  A     About three days a week, I could not tell you those

25  hours.

*THERESA J. CASAL, RPR, CRR*
*UNITED STATES DISTRICT COURT - NDNY*

*Nolin - Cross*

1   Q    You testified that sometimes you'd get to work and she

2   would not be there, correct?

3   A    Correct.

4   Q    Did you hear her testify a few moments ago today?

5   A    I did.

6   Q    Do you recall her testifying that she would do various

7   jobs and among them would be to go to the bank for deposits,

8   go shopping for supplies?

9   A    Yes.

10  Q    Is it possible that when you arrived to work, not

11  seeing Miss Prue, that she could have been depositing bank

12  checks or doing banking work or picking up supplies?

13  A    No, sir.  The bankin' would be done before I came to

14  work.

15  Q    And how do you know that?

16  A    And any supplies that she would go to get she would

17  bring back immediately to be put in the cooler.

18  Q    How do you know that, sir?

19  A    Because I would be the employee workin' when she came

20  back.

21  Q    But how do you know it would be exactly as you say and

22  that she would not deviate in any manner?

23  A    Why would you go buy stuff for the Legion at one,

24  2 o'clock in the afternoon and not come back until

25  10 o'clock that night or the next day?

*Nolin – Cross*

1    Q    That wasn't my question, sir.

2    A    What was your question?

3    Q    I'll try and put it another way for ya.  You don't

4    actually know whether she was conducting banking work or

5    whether she was shopping for supplies, do you?

6    A    When?

7    Q    At any time.  Do you know --

8         THE COURT:  May I interject here?  We need to

9    focus this on one year, April 2011 to April 2012.  So let's

10   be specific, both of you, with respect to your questions.

11        MR. MORGADO:  Understood, your Honor.

12   BY MR. MORGADO:

13   Q    During April -- between April of 2011, to April of

14   2012, do you know how many hours per week, on average,

15   Miss Prue worked?

16   A    From what I observed?

17   Q    Yes.

18   A    Twenty to 30 hours a week.

19   Q    Because you only observed her working 20 to 30 hours a

20   week, correct?

21   A    Correct.

22   Q    Because there were days that you did not know whether

23   or not she was working, correct?

24   A    Correct.

25   Q    And this was during the time span the Court just

*Beard – Direct*

1  reminded us, April 2011 to April 2012, correct?

2  A    Correct.

3         MR. MORGADO:  I have no further questions, your

4  Honor.

5         THE COURT:  Any redirect?

6         MR. MILLS:  No, your Honor.

7         THE COURT:  All right.  You may stand down.

8                (Witness was excused.)

9         MR. MILLS:  I call Robert Beard.

10         THE CLERK:  Sir, would you please raise your right

11  hand and state your full name for the record, please.

12         THE WITNESS:  Robert J. Beard, B-E-A-R-D.

13         **R O B E R T    J.    B E A R D,**

14  having been duly sworn by the Clerk of the Court, was

15  examined and testified as follows:

16  **DIRECT EXAMINATION BY MR. MILLS:**

17  Q    Mr. Beard, are you associated with the defendant Post?

18  A    Yes, I am.  I'm --

19  Q    What are your positions with the defendant Post?

20  A    I am the judge advocate for Post 574 and also the house

21  manager.

22  Q    Now, are you paid?

23  A    Yes, I am.

24  Q    What are you paid?

25  A    $400 a week.

*Beard - Direct*

1    Q    For what services?

2    A    To -- I do the banking every morning, I organize

3    rentals for our hall, I order goods, liquor, beer for the

4    Legion, and I also manage the bartenders and the cleaner.

5    Q    What do you do for the Post that you're not paid for?

6    A    I pretty much do everything.  I volunteer to help with

7    maintenance, I volunteer for parties, I cook, I do pretty

8    much anything you would think a legionnaire would do.

9    Q    Are you paid to be a judge advocate?

10   A    No, I'm not.

11   Q    Okay.  How much time does it take you per week to do

12   the job of house manager?

13   A    They pay me for 40 hours a week, but I don't even come

14   close to that.  We talk about banking in the morning, the

15   whole deal may take a half-hour to do your paperwork, go to

16   the bank.  Ordering is on Mondays, I call five distributors,

17   that takes me about a half-hour.  On a daily basis, my

18   actual job probably takes an hour-and-a-half.

19   Q    And what would be the maximum amount of time you would

20   spend in a week on the job as house manager?

21   A    Well, my actual work hours, to be honest, would be

22   close to 15, 20 hours, but I stay around and do other odd

23   jobs, I visit with my fellow comrades.

24   Q    Was there ever a change in the time that deliveries

25   were made?

*Beard - Cross*

1   A    Yes.  When I first took over in December of 2012, all

2   deliveries seemed to be coming in in the afternoon and I

3   come in every morning at eight and worked 'til 1 o'clock,

4   2 o'clock.  And I had that changed around to day deliveries

5   so other people wouldn't have to do my work.

6   Q    Have you observed the plaintiff, Joey Prue, at the

7   Post?

8   A    Yes, I did.

9   Q    Can you give an estimate of how often she was there?

10  A    I can't give an estimate on hours, but I can say I very

11  rarely saw her.  She was mostly an afternoon person and many

12  times I go down to the Legion, sometimes a little early

13  'cause we open up and trucks would be waiting out in the

14  parking lot complaining.

15           THE COURT:  Mr. Mills, again, we have to confine

16  it to the time period that's in issue here.

17           MR. MILLS:  Okay.  I have no further questions for

18  this witness, your Honor.

19           THE COURT:  You haven't established anything about

20  the time period in question.  All right.  Any cross?

21  **CROSS-EXAMINATION BY MR. MORGADO:**

22  Q    It's Mr. Beard, correct?

23  A    Yes.

24  Q    When did you take over the job as house manager?

25  A    Mid December of 2012.

*Beard - Cross*

1  Q    And how many members were part of Post 574 at this

2  time?

3  A    Oh, gosh, I'd say about 350 or more.

4  Q    Are you still the house manager today?

5  A    Yes, I am.

6  Q    Has there been a decrease in membership?

7  A    No.  Increase.

8  Q    Increase.  Is the Post as busy as it was back in mid

9  2012 as it is today?

10  A    We make a lot of money, yes.

11  Q    And you had testified that as a house manager, you

12  spend about 15 to 20 hours per week, correct?

13  A    That's stretchin' it, yes, actually doin' the job as

14  house manager.

15  Q    But this was after April 2012, correct?

16  A    Yes.

17  Q    Okay.  And correct me if I'm wrong, but you don't know

18  how many hours that Miss Prue worked per week when she was

19  the house manager, correct?

20  A    I was a witness to her not being around very often,

21  other than to do jobs outside the Post duties.

22  Q    You witnessed her not being around.  Is that 'cause you

23  weren't around all that often?

24  A    I was around.

25  Q    And what were you doing during this time period --

*Beard – Cross*

1  A    I was volunteering my time --

2  Q    Let me finish my question.  From April 2011 to

3  April 2012, what jobs were you doing at the American Legion?

4  A    I was doing my job as the judge advocate and member of

5  the E Board.

6  Q    Those are non-- not paid jobs, correct?

7  A    They didn't need to be paid.

8  Q    So that's a "yes"?

9  A    Yes.

10 Q    And how many hours per week did ya spend between

11 April 2011 and April 2012 as a member of the E Board and as

12 a judge advocate?

13 A    Well, I don't have an exact number in my head, but I'm

14 69 years old and it's kinda my home away from home, so I

15 spend quite a few hours down there.  I can't give ya a

16 definite number.

17 Q    Give me your best recollection.  So what would be your

18 best estimate?

19 A    There is no estimate.  I spend most of my time down

20 there.

21          THE COURT:  Give an estimate, please.

22          THE WITNESS:  Forty hours a week maybe.

23 Q    Did you hear Miss Prue testify earlier today?

24 A    Yes, I did.

25 Q    Do you recall her testifying on average she spent

*Beard — Cross*

1  approximately 55 hours per week doing her duties as house

2  manager during this time?

3  A    Impossible.

4  Q    That wasn't my question.  My question was do you recall

5  her saying that?

6  A    Yes, I do.

7  Q    And you've testified that during that time frame, you

8  were only there for, on average, 40 hours per week, correct?

9  A    I'm paid for 40 hours.

10  Q    Okay.  So you're saying you were there more than

11  40 hours per week?

12  A    On my own time.

13  Q    Okay.  And describe for me the Legion; is it a

14  single building, is it multiple stories, two-story building,

15  et cetera?

16  A    It's a two-story building.

17  Q    And were you able to observe Miss Prue every hour of

18  every day that you were there during this time period we're

19  talking about?

20  A    No.

21          MR. MORGADO:  No further questions.

22          THE COURT:  Any redirect?

23          MR. MILLS:  No redirect, your Honor.

24          THE COURT:  All right.  You may stand down.

25          THE WITNESS:  Thank you.

*Touart – Direct*

1                    (Witness was excused.)

2              MR. MILLS:  I'd like to call Basil Touart.

3              THE CLERK:  Would you please step forward, sir.

4    Thank you.  Would you please raise your right hand and state

5    your full name for the record, please.

6              THE WITNESS:  Basil Frank Touart, Jr.

7              THE CLERK:  Would you please spell your name for

8    the court reporter?

9              THE WITNESS:  B-A-S-I-L, Frank, T-O-U-A-R-T.

10       **B A S I L     F.     T O U A R T,   J R.,**

11   having been duly sworn by the Clerk of the Court, was

12   examined and testified as follows:

13   **DIRECT EXAMINATION BY MR. MILLS:**

14   Q    Do you recall when the plaintiff, Joey Prue, was hired

15   as house manager?

16   A    Yes.  I was Commander then.

17   Q    And you were involved in that, right?

18   A    Yes, I was.

19   Q    Did you tell her anything about her duties?

20   A    We actually had a duty form, and I also told her it was

21   a 40-hour position.

22   Q    Did you say anything to her about whether she was

23   allowed to work more than 40 hours?

24   A    No, sir.

25              MR. MILLS:  Okay.  I have no further questions for

*Touart - Cross*

```
 1   this witness.
 2                  THE COURT:  All right.
 3                        (Pause in proceedings.)
 4   CROSS-EXAMINATION BY MR. MORGADO:
 5   Q    You testified, sir, about a form, or some kind of a job
 6   type description form, is that correct?
 7   A    Yes, sir.
 8   Q    Do you recall what the form was called?
 9   A    I do not.  We drew up one for the janitor and one for
10   the house manager.
11                        (Pause in proceedings.)
12   BY MR. MORGADO:
13   Q    Do you -- if I said it was called the American Legion
14   Hudson Falls Post 574 Duties of the House Custodian form,
15   with 21 paragraphs, would that refresh your recollection as
16   to the name of the document?
17   A    For the custodian?
18   Q    Correct.
19   A    I wouldn't know how many paragraphs were in it.
20   Q    That's not the form you're talking about?
21   A    I would have to see it.
22                        (Pause in proceedings.)
23   BY MR. MORGADO:
24   Q    Do you recall if you -- were you the author of the form
25   you're talking about?
```

*Touart - Cross*

1   A     No.

2   Q     Do you know who was?

3   A     The E Board made a list, Joy participated in it, for

4   the janitor.

5   Q     Did you ever serve as the house manager?

6   A     No.

7   Q     Okay.  And I believe -- and you never wrote a job

8   duties form for the duties of house manager, is that

9   correct?

10  A     Yes.  Specifically, myself, no.  Did I have input in

11  it?  Yes.

12  Q     Okay.  What are the duties of house manager?

13  A     The house manager is to order all the liquor, generally

14  make sure that the building is kept in decent condition.  If

15  it's not, get whoever to put it in that condition.  They

16  ordered the liquor, the beer.  Anything associated with the

17  lounge, they order.  They book parties.  They make sure the

18  contracts are completed, deposits are paid.  They go to the

19  bank, go to the grocery store if they need to.

20  Q     Is it fair to say they do a lot of different things?

21  A     Yes.

22  Q     If I was to tell you that the house custodian, the form

23  that we're talking about said that the house custodian would

24  be expected --

25              THE COURT:  Counsel, do you have an exhibit you

*Touart - Cross*

1   wish to identify?

2          MR. MORGADO:  The projector is not --

3          THE COURT:  Beg your pardon?

4          MR. MORGADO:  I have a -- it would be the

5   plaintiff's proposed Exhibit 2 that was originally

6   identified in our pre-- in our submissions, but I don't have

7   the --

8          THE COURT:  In your submission where?

9          MR. MORGADO:  I believe it was listed on our

10  exhibit list.

11         THE COURT:  You may have, but it hasn't been

12  identified as an exhibit for this hearing, nor has it been

13  admitted.

14         MR. MORGADO:  Right, your Honor, I am not gonna

15  offer it into evidence.

16         THE COURT:  Then you may not talk about it.

17         MR. MORGADO:  I'll move on.

18         THE COURT:  All right.

19  BY MR. MORGADO:

20  Q    Do you know how many hours Miss Prue worked during the

21  week on average between April 2011 and April 2012?

22  A    Are you asking me if I know exactly or if I'm gonna

23  estimate on it?

24  Q    I'm asking you simply if you know?

25  A    By the amount of time that I spent in there during my

*THERESA J. CASAL, RPR, CRR*
*UNITED STATES DISTRICT COURT - NDNY*

*Touart - Cross*

1    years as Commander, I'd have to say yes.

2    Q    And you were able to observe her during all of her

3    working hours, is that correct?

4    A    Yes.

5    Q    Okay.  And did you -- was she in your view the entire

6    time she was working during this relevant time period?

7    A    The entire time?  No.

8    Q    So is it fair to say that there were sometimes you

9    wouldn't know if she was working or not?

10   A    Yes.

11   Q    So how is it, again, that you know exactly what her

12   working hours were during this time period?

13   A    Because she was back in the corner, at a little table

14   that she set up to tutor a student of one of our barmaids

15   and she also did work on her travel agency and on her school

16   work to get her degree.

17   Q    I don't believe that was my question.  How is it that

18   you know she was doing travel agent work in a corner?

19   A    Because I observed it.  She also told me she was.

20   Q    Did she.  And when did she have this conversation with

21   you?

22   A    Durin' the day when I was there and she was there.

23   Q    What day was it?

24   A    It could have been any day durin' the week.

25   Q    What year was it?

*Touart - Cross*

1   A   2011.

2   Q   And did you make any notes of these conversations?

3   A   No.  I really didn't feel like it was necessary.

4   Q   Okay.  And why was that?

5   A   Because she was an employee.  If she was gonna do a

6   little bit of work in the building, I didn't care.  I wasn't

7   payin' her for it, so why would I care.

8   Q   Why weren't you payin' her for her work?

9   A   Because it wasn't house manager related work.  We

10  assume that we're all honest people.  We also have a

11  veterans' organization --

12          THE COURT:  Mr. Touart, there isn't a question

13  before you.

14          THE WITNESS:  I'm sorry.

15          THE COURT:  Let me interject again.  Would you

16  please focus on the time frame we are concerned about and

17  what his knowledge is of her work during that period of

18  time.  I don't want to hear anything other than that.  Are

19  we clear, gentlemen?  We are wastin' a lot of time here.

20          MR. MORGADO:  I have no further questions, your

21  Honor.

22          THE COURT:  You may stand down.

23          THE WITNESS:  Thank you.

24              (Witness was excused.)

25          MR. MILLS:  I'd like to call Mary Gebo.

*Gebo – Direct*

1          THE CLERK:  Would you please raise your right hand

2     and state your full name for the record, please.

3          THE WITNESS:  Mary Elizabeth Gebo, G-E-B-O.

4              **M A R Y    E.    G E B O,**

5     having been duly sworn by the Clerk of the Court, was

6     examined and testified as follows:

7     **DIRECT EXAMINATION BY MR. MILLS:**

8     Q    Are you associated with the defendant Post?

9     A    I can't hear.

10    Q    Are you associated with the defendant Post?

11    A    Yes, I am.

12    Q    What's your position with the Post?

13    A    I'm the finance officer.

14    Q    How long have you had that position?

15    A    About seven years.

16    Q    Did you have any -- well, let me ask you this:  Did you

17    see time cards during the relevant period that we are

18    talking about here from the plaintiff?

19    A    Yes, I did.

20          THE COURT:  April 2011 through April 2012?

21          THE WITNESS:  Yes, I did.

22    Q    And could you describe those?

23    A    They're made out so the employee's name, position, time

24    in and time out is registered and goes from Monday through

25    Sunday and then they put their times in, times out, and then

*Gebo — Cross*

```
1   I usually put in the total hours worked and add them up.

2   And they sign the cards and then I always put down paid, the

3   data that they were paid and the check number.

4   Q    Okay.  Did you ever have a discussion with the

5   plaintiff about hours?

6   A    Maybe once or twice, not every week, but --

7   Q    Do you remember anything about that?

8   A    Do I remember anything about that?

9   Q    Yeah.

10  A    Yes, I did speak a couple times.

11  Q    Well, what did she say and what did you say?

12  A    Well, I just mentioned that there was a lot of hours

13  down and, basically, I just figured that she was being

14  honest and had been there that time, I'm not there all the

15  time, I'm only there three days a week, maybe 20 hours

16  total, so there was a lot of time I was not there when Joy

17  would be working.

18       MR. MILLS:  No further questions.

19  CROSS-EXAMINATION BY MR. MORGADO:

20  Q    Good afternoon, Mary.

21  A    Good afternoon.

22  Q    How are you?

23  A    Fine, thank you.

24  Q    You testified a moment ago that you saw time cards for

25  employees of the Legion, including Miss Prue, that were
```

*Gebo — Cross*

1    between the time period of April 2011 and April 2012, is

2    that correct?

3    A    Yes.

4    Q    Okay.  And you specifically recall seeing Miss Prue's

5    time cards during that time, is that correct?

6    A    Yes.

7    Q    And I believe you had just lastly testified that you

8    had mentioned to Miss Prue or you expressed to her, rather,

9    wow, that was, you know, that was a lot of hours that she

10   had put down, is that correct?

11   A    Yes.

12   Q    Okay.  And on the time card, do you recall, was it more

13   than 40 hours per -- you know, in a week?

14   A    Yes.

15   Q    Okay.  And again, to confirm, this was between

16   April 2011 and April 2012, right?

17   A    Yes.

18   Q    Okay.  And do you recall the number of hours that were

19   on those time cards on a regular basis; in other words, per

20   week, was it 48, was it 53, et cetera?

21   A    It was various times.

22   Q    But consistently more than 40 hours per week?

23   A    Yes.  After the beginning.  I don't know exactly how

24   many months after that, but that's when it started over

25   time.  When she first started, it was written across the

*Gebo – Cross*

 1  face of the time card salary, so there wasn't any hours put

 2  in, and then it was I don't know how many months after that

 3  that the hours started being put in.

 4          THE COURT:  Is that between this time period?

 5          THE WITNESS:  Yes.

 6          THE COURT:  2011, 2012?

 7          THE WITNESS:  Yes, your Honor.

 8          THE COURT:  All right.

 9  BY MR. MORGADO:

10  Q    I guess, just to clarify, during this time period, you

11  saw some time cards in the beginning that didn't have any

12  hours filled in and you saw some time cards that had hours

13  indicating more than 40 per week filled in between

14  April 2011 and April 2012, is that correct?

15  A    Yes.

16  Q    And you said you're the finance officer, is that

17  correct?

18  A    Yes.

19  Q    Is that an executive position?

20  A    Yes, it is.

21  Q    So you knew that Miss Prue was telling you that she was

22  working a lot of hours during this time period, is that

23  correct?

24  A    According to the time cards, yes.

25  Q    And did you bring this -- did you tell her not to work

*Gebo – Cross*

1   that many hours?

2   A     That wasn't my position to tell anybody that.

3   Q     Where are these time cards?

4   A     I'm sorry?

5   Q     Where are the time cards?

6   A     I have -- we have them stored upstairs in the

7   storage -- in filin' cabinets.

8   Q     Do you know why you haven't produced them in this case?

9             MR. MILLS:  Objection, your Honor.  They have been

10  produced.

11            THE COURT:  I beg your pardon?

12            MR. MILLS:  They have been produced.

13            THE COURT:  They have been produced?

14            MR. MILLS:  Yes.  I object to that question.

15            MR. MORGADO:  I'll ask another question.

16            THE COURT:  They have been produced though?

17            MR. MILLS:  Yes, your Honor.

18            MR. MORGADO:  That's not my understanding.

19            THE COURT:  Where are they? I don't have them.

20  Counsel, did you produce them to this Court during the

21  course of this lawsuit?

22            MR. MILLS:  No.  They were produced between

23  attorneys, your Honor.

24            THE COURT:  Well, the attorneys don't have to make

25  a decision, I do.  Are you saying you have those cards and

*Gebo - Cross*

1   they haven't been provided to the Court yet, is that

2   correct?

3            MR. MILLS:  I have copies of them somewhere, your

4   Honor, but not here in Albany, but the ones that have time

5   on them, it's my understanding are not --

6            THE COURT:  They're what?

7            MR. MILLS:  My understanding, your Honor, the ones

8   that have time on 'em is not the period your Honor is asking

9   about today.

10            THE COURT:  She just testified that there were

11   time cards that she saw, we are talking about between

12   April 2011 and April 2012, are kept somewhere in the --

13   apparently at the Legion, upstairs of the Legion, I believe,

14   is that what you said, upstairs?

15            THE WITNESS:  Yes, your Honor, they're upstairs in

16   the filing cabinets.

17            THE COURT:  And they have not been produced or

18   have been produced?  You're not clear here.

19            MR. MORGADO:  To the best of my recollection, I do

20   not have those.  Put it this way --

21            THE COURT:  You would know if you had 'em or not,

22   Counsel.  The best of your recollection is not what I'm

23   asking for.  Do you have them or don't you have them?

24            MR. MORGADO:  I do not have time cards produced by

25   the defendants that have time indicated on them for the

*Gebo — Cross*

1    relevant time period we are talking about today.

2              THE COURT:  But they're in existence somewhere?

3              MR. MORGADO:  Allegedly.

4              THE COURT:  Counsel?

5              MR. MILLS:  My memory, your Honor, is that there's

6    a full complete copy of these attached to one of their

7    motions in this case.

8              THE COURT:  That's not my question.

9              MR. MILLS:  Okay.

10             THE COURT:  Where are the time cards?

11             MR. MILLS:  The time cards?  Well, I don't know

12   personally.  I do know that I have photocopies of them and

13   they have photocopies of them.

14             THE COURT:  We are gonna take an adjournment here,

15   I want to see counsel in chambers.

16                      (In chambers at 3:05 PM.)

17             THE COURT:  Now, what is goin' on here?

18             MR. MILLS:  Your Honor, I believe that this

19   witness didn't understand the exact time frame she was

20   testifying about, because Your Honor, in a prior decision,

21   referred to these time cards.

22             THE COURT:  You just said the time cards do exist.

23             MR. MILLS:  Yes.  Your Honor saw them because Your

24   Honor made a decision based on them.

25             THE COURT:  Between April 2011 and April 2012?

*Gebo - Cross*

1          MR. MILLS:  The time cards simply have the word

2    salary written on them, they don't have numbers.

3          THE COURT:  She testified otherwise.

4          MR. MILLS:  I know.  She got mixed up about what

5    the time period was, your Honor.

6          THE COURT:  Is that your understanding, too?

7          MR. MORGADO:  I can't -- I cannot say that that

8    would not be a reasonable explanation as to what's going on

9    here.  I can only say what I know which is I don't have any

10   during the time period that have, you know, actual hours on

11   'em.  I'm fine with the witness' testimony, but, ya know --

12         THE COURT:  Counsel, the question is:  Is that

13   your understanding, too, that the time cards between

14   April 2011 and April 2012 did not have hours on 'em but only

15   had salary written across 'em?  Yes or no.

16         MR. MORGADO:  Yes.

17         THE COURT:  All right.  Do you want to talk to

18   your witness, 'cause obviously, if that's the case, then she

19   is mistaken as to the testimony.

20         MR. MORGADO:  Not my witness, do you mean --

21         MR. MILLS:  My witness.

22         THE COURT:  I know it's his witness, but she's

23   testifying salary was written on there.  If the actual fact

24   of the matter is there are no hours on it, if you both agree

25   with that, then the testimony makes no sense.

*Gebo - Cross*

1          MR. MORGADO:  Right.  The only value of the

2     testimony, at least in my mind, is she has confirmed that

3     Miss Prue was working a good amount of hours and she's also

4     confirmed that an officer had knowledge, and I just -- you

5     know those are two points that I thought were --

6          MR. MILLS:  I don't think that's what she

7     testified.  She testified that the witness put down a good

8     number of hours on the card.

9          MR. MORGADO:  I am not gonna fight the legal

10    points.

11         THE COURT:  But we don't have the time frame we

12    are talkin' about.  Might be a later time frame is what

13    you're saying.

14         MR. MORGADO:  It may be.  Unless the time cards

15    are there and, obviously, you know --

16         THE COURT:  Let's go back and finish up her

17    testimony because you just clarified this for the record, as

18    far as both counsel know there are no time cards that

19    existed during that period of time that reflected the number

20    of hours on the cards, it was only thereafter that they

21    started keeping tracks of the hours, is that correct?

22         MR. MILLS:  That's correct, your Honor.

23         THE COURT:  All right.  We will get that and take

24    it for what it's worth.  Gentlemen, you're gonna have to

25    focus your questions, not just generalizations, all right?

*Gebo - Cross*

1                    (In open court at 3:10 PM.)

2           THE COURT:  Okay, let's try this again now.

3    Counsel, do you wish to proceed first?  Mr. Mills or

4    Mr. Morgado.

5           MR. MORGADO:  If I could just finish.

6           THE COURT:  All right.  Finish your examination.

7    BY MR. MORGADO:

8    Q    Mary, we were talking about some time cards before we

9    had a break there.  Do you recall whether between April of

10   2011 and April of 2012, besides time cards, there was any

11   other written document that Miss Joy Prue's hours worked

12   were written down on?

13   A    At the time, the payroll sheet that I used would have

14   the same thing on it.

15   Q    The payroll sheet you're referring to, are you talking

16   about simply transferring over whatever's on the time card

17   to a payroll sheet, is that correct?

18   A    Yes.

19   Q    Where are these payroll sheets kept?

20   A    They're in the filing cabinets with the time cards.

21   Q    Do you have a payroll company that --

22   A    No, I do the payroll.

23   Q    In other words, you print out the checks, et cetera,

24   with the pay stubs?

25   A    Yes.

*Gebo – Redirect*

1  Q    And do the pay stubs indicate how many hours an

2  employee works?

3          THE COURT:  Well, again, we are focusing between

4  April 2011 and April 2012.  Here's the problem that's come

5  up:  Both counsel agree they don't have any record of pay --

6  or any sort of a time card or pay voucher that reflects the

7  number of hours that the plaintiff, Miss Prue, worked durin'

8  that time frame.  Apparently, the practice was to put salary

9  on the employee and whatever the salary was she received,

10 that was the practice?

11         THE WITNESS:  In the beginning, when Miss Prue

12 first came, she wrote salary across the card.  I can't

13 remember how far in it was that the hours started bein' put

14 down on the time card.

15         THE COURT:  So it could have been after

16 April 2012.

17         THE WITNESS:  It could have been.  I really don't

18 remember.

19         THE COURT:  All right.  I think that's been

20 established.

21         MR. MORGADO:  I have no further questions.

22         THE COURT:  All right.

23 **REDIRECT–EXAMINATION BY MR. MILLS:**

24 Q    Is it correct that there was -- was there a time when

25 it changed from salary to numbers?

*THERESA J. CASAL, RPR, CRR*
*UNITED STATES DISTRICT COURT – NDNY*

*Gebo — Redirect*

1    A    Yes.

2    Q    Do you remember exactly when that was?

3    A    No.

4    Q    Do you remember whether it was before or after

5    April 2012?

6              THE COURT:  That's what I just covered with her.

7              MR. MILLS:  What?

8              THE COURT:  That is what I just covered with her.

9              MR. MILLS:  Okay.

10             THE COURT:  All right.  Any further questions?

11   Thank you.

12             THE WITNESS:  Thank you.

13                     (Witness was excused.)

14             THE COURT:  Any other witnesses?

15             MR. MILLS:  Yeah, I have -- let me call Mr. Robert

16   Cheeney.

17             THE CLERK:  Would you please raise your right hand

18   and state your full name for the record, please.

19             THE WITNESS:  Robert Francis Cheeney --

20             THE CLERK:  Could you please spell -- I'm sorry, I

21   didn't mean to cut you off.

22             THE WITNESS:  Robert Francis Cheeney, Sr.

23             THE CLERK:  Would you please spell your last name

24   for the court reporter.

25             THE WITNESS:  C-H-E-E-N-E-Y.

*Cheeney − Direct*

 1          THE CLERK:  Thank you.

 2      **R O B E R T     F.     C H E E N E Y,  S R.,**

 3  having been duly sworn by the Clerk of the Court, was

 4  examined and testified as follows:

 5  **DIRECT EXAMINATION BY MR. MILLS:**

 6  Q    You're associated with the defendant Post?

 7  A    Yes, sir.

 8  Q    What's your position?

 9  A    I'm historian.

10  Q    And have you had other positions?

11  A    Yes.  I'm party bartender runner durin' parties only.

12  Q    During the period April 2011 to April 2012, did you

13  have an opportunity to observe the plaintiff?

14  A    Yes.  From time to time, because when -- there was a

15  gentleman named Phil Fish, Jr., that helped a lot, he's a

16  bartender there, and when we went in to help him open up,

17  like he said, the orders were there but nobody was there to

18  receive 'em, and he had to receive 'em.  And he did

19  ordering, stuff like that, and just a lotta times she just

20  wasn't there, and there was times when she was sick and --

21  yeah.

22  Q    About how much time did you spend at the Post that

23  year?

24  A    Off and on, maybe 10, 20 hours a week.

25          MR. MILLS:  No further questions.

*Cheeney - Cross*

1          THE COURT:  All right.

2   **CROSS-EXAMINATION BY MR. MORGADO:**

3   Q    Sir, if you said it, I didn't hear it.  Could you state

4   your name for the record?

5   A    Robert Francis Cheeney, Sr.

6   Q    I believe you testified that between April of 2011

7   and April 2012 that you were at the Legion between 10 and

8   20 hours a week, is that correct?

9   A    Roughly about that.

10  Q    How many hours then were you able to observe Miss Prue

11  during that same time frame?

12  A    If she was there, there was times she was doin' her

13  jobs and time she wasn't, so...

14  Q    My question is:  How many hours between the 10 and

15  20 per week that you were there would you observe her

16  working, okay?

17  A    Yes.

18  Q    During this time period?

19  A    Yes.

20  Q    What's the number?

21  A    Oh, it's tough to say because I wasn't really keepin'

22  track of it, so I'm sorry.

23  Q    You weren't keepin' track of it, right?

24  A    Yes.

25  Q    So it's less than 20, right?

*Cheeney - Cross*

1          THE COURT:  Less than 20 hours he was there, is

2  that what you're saying?

3          MR. MORGADO:  I believe he testified that he was

4  there during this time frame less than 20 hours and I'm

5  asking him to confirm.

6          THE COURT:  I understand that's what he testified

7  to, yes, that's what we have.

8  BY MR. MORGADO:

9  Q    And during your time, the 10 to 20 hours you were

10  there, were you working the entire time?

11  A    No.  I wasn't working at the time.  I was just helpin'

12  out volunteering.

13  Q    During some of that time you were there 10 to 20 hours

14  per week, were you drinkin'?

15  A    Yeah, I was sittin' there with the guys havin' a beer,

16  so...

17          MR. MORGADO:  No further questions, your Honor.

18          THE COURT:  Again, this is April 2011 to

19  April 2012?

20          THE WITNESS:  Yes, your Honor.

21          THE COURT:  During that period of time, did you

22  see the plaintiff doing other work?

23          THE WITNESS:  Yes.  She had a computer in the

24  corner that she was working on because at the time, like I

25  said, I'm historian there and she was askin' me for chips

*THERESA J. CASAL, RPR, CRR*
*UNITED STATES DISTRICT COURT - NDNY*

*Cheeney — Cross*

1    for pictures and she was observing how much I was takin' of

2    the Post and how many pictures was on there for what I took

3    at home.

4              THE COURT:  I'm sorry, pictures?

5              THE WITNESS:  Yes.  'Cause I take a lot of

6    pictures there.

7              THE COURT:  And she asked you about takin' some

8    pictures?

9              THE WITNESS:  It's pictures that I had on a chip

10   from the camera and I gave it to her so she could observe

11   'em, so -- on her computer.

12             THE COURT:  She just asked you for those pictures.

13   Did you ever see her doing other work when she was on her

14   position as house manager?

15             THE WITNESS:  Yeah, from time to time, yes.

16             THE COURT:  What was that?

17             THE WITNESS:  Well, 'cause she was makin' sure the

18   bartenders were doin' their job 'cause she was pretty strict

19   about that --

20             THE COURT:  Okay.

21             THE WITNESS:  -- and doin' different duties.

22             THE COURT:  All right.  Okay.  Anything further?

23             MR. MORGADO:  Nothing further, Judge.

24                  (Witness was excused.)

25             THE COURT:  Okay.  You may call your next witness.

*THERESA J. CASAL, RPR, CRR*
*UNITED STATES DISTRICT COURT — NDNY*

*Folk - Direct*

1          MR. MILLS:  I call Margaret Folk.

2          THE CLERK:  Would you please raise your right hand

3    and state your full name for the record, please.

4          THE WITNESS:  Margaret Mary Folk, F-O-L-K.

5          THE CLERK:  Thank you.

6        **M A R G A R E T     M.     F O L K,**

7    having been duly sworn by the Clerk of the Court, was

8    examined and testified as follows:

9          THE COURT:  All right.

10   **DIRECT EXAMINATION BY MR. MILLS:**

11   Q    Are you a member of the the American Legion?

12   A    Yes, I am.

13   Q    What Post?

14   A    278, Saratoga Post, in Schuylerville.

15   Q    Okay.  Have you held statewide positions in the

16   American Legion?

17   A    Yes, I have.

18   Q    What positions?

19   A    I've been Post Commander, I've been County Commander,

20   District Commander and, of course, before that the Vice,

21   naturally.  I have been Department Vice Commander.

22   Q    When you were District Commander, was the Hudson Falls

23   Post in your jurisdiction?

24   A    I'm sorry?

25   Q    When you were Vice Commander, was the Hudson Falls Post

*Folk - Cross*

1   in your jurisdiction?

2   A    Yes, it was.

3   Q    Did you spend a lot of time at that Post?

4   A    Yes.

5   Q    How much time, let's say between September 2011 and

6   September 2012, how much time did you spend at that Post?

7   A    Weekly or daily?

8   Q    Well, daily.

9   A    In the beginning, about ten hours a day maybe -- I mean

10  a week, sorry.

11  Q    Now, did you observe deliveries being made to that

12  Post?

13  A    No, I did not.

14  Q    Okay.  Did the plaintiff tell you anything about her

15  memory?

16  A    Yes.

17  Q    What did she tell you?

18  A    When I first met her, I didn't know who she was, I was

19  in the lounge, and she come up to me and she told me that

20  she was new onboard there, new member, and she had a problem

21  with her brain and she -- most of the time she couldn't even

22  remember her children's names.

23         MR. MILLS:  No further questions, your Honor.

24  **CROSS-EXAMINATION BY MR. MORGADO:**

25  Q    What was the problem with her brain, could you

*THERESA J. CASAL, RPR, CRR*
*UNITED STATES DISTRICT COURT - NDNY*

*Folk – Cross*

1  elaborate?

2  A    I have no idea.  She just told me that she had

3  something wrong with her brain and she couldn't remember her

4  children's names.

5  Q    Do you understand -- did you hear her testify she was a

6  graduate of college?

7  A    Yes.

8  Q    Okay.  And from your observations and knowing her, is

9  there -- do you have any cause for concern she has brain

10  problems?

11  A    Yes.

12  Q    And what kind of brain problems do you believe she has?

13  A    Well, I was supposed to meet her at the Post, she was

14  going to a school that the American Legion puts on and she

15  wanted to borrow one of my hats to go because you need the

16  hat when you go to college, and she didn't remember to come

17  and get it.

18  Q    So she forgot her hat?

19  A    And when I asked her about it, she said, "Oh, I didn't

20  remember."

21  Q    So she forgot her hat, correct?

22  A    Well, she finally got it, I had to go back home for it.

23  Q    During the time of April 2011 and April 2012, how many

24  hours of work did you observe Miss Prue conduct?

25  A    I don't know.  I saw her on and off.  I was in and out.

*THERESA J. CASAL, RPR, CRR*
*UNITED STATES DISTRICT COURT – NDNY*

*Folk - Cross*

1   I know lots of times she wasn't there when I was there.

2   Q    The ten hours per week that you were there, correct?

3   A    Right.

4   Q    Okay.  The other, let's see, 45 hours that she's

5   claiming that she was there, you weren't there, is that

6   correct?

7   A    Sometimes I was, sometimes I wasn't.  Sometimes I would

8   go to the Post meetings.

9            MR. MORGADO:  I have no further questions, your

10  Honor.

11           THE COURT:  Any redirect?

12           MR. MILLS:  No, your Honor.

13           THE COURT:  All right.  You may stand down.

14                     (Witness was excused.)

15           MR. MILLS:  Your Honor, I'd like to call Chris

16  Fontaine.

17           THE COURT:  All right.

18           THE CLERK:  Would you please raise your right hand

19  and state your full name for the record, please.

20           THE WITNESS:  Chris A. Fontaine, Senior,

21  F-O-N-T-A-N-I-E.

22                     - - - - -

23

24

25

*Fontaine – Direct*

1    C H R I S    A.    F O N T A I N E,   J R.,

2    having been duly sworn by the Clerk of the Court, was

3    examined and testified as follows:

4         THE COURT:  All right, you may proceed.

5    **DIRECT EXAMINATION BY MR. MILLS:**

6    Q    Are you a member of the Post defendant here?

7    A    Yes, sir.

8    Q    Have you been an officer of that Post?

9    A    Yes, sir.

10   Q    What's the most important office you've held in that

11   Post?

12   A    I was Commander for two years.

13   Q    From when to when?

14   A    2012 to 2013, '14, I can't remember the dates.

15   Q    Would that be starting in or about June of 2012?

16   A    Yeah, it would be.

17   Q    How much time did you spend at the Post when you were

18   Commander?

19   A    Maybe 30 hours a week.

20   Q    Did you observe the plaintiff?

21   A    Yes.

22   Q    Were you able to observe how much time she spent at the

23   Post?

24   A    No, I wasn't, 'cause I was working.

25   Q    Did you observe her working?

*Fontaine – Direct*

1          THE COURT:  When, Counsel?  Counsel.

2          MR. MILLS:  Yes.

3          THE COURT:  When?

4   Q    Oh, while you were Commander and before September 2012.

5          THE COURT:  He was Commander in 2012 to 2014,

6   that's after the dates we're concerned about.

7          MR. MILLS:  No, your Honor, he stated he was

8   Commander from June 2012 --

9          THE COURT:  Yes.

10          MR. MILLS:  -- to June 2014.

11          THE COURT:  I understand that.  The period of time

12   we're concerned about is April 2011 to April 2012.

13          MR. MILLS:  Okay, your Honor.

14          THE WITNESS:  I was First Vice then.

15   BY MR. MILLS:

16   Q    Well, what was your position at the Post before June of

17   2012?

18   A    I was First Vice Commander.

19   Q    Okay.  How much time did you spend at the Post during

20   that period?

21   A    Maybe 30 hours a week.

22   Q    Were you involved in hiring of the plaintiff?

23   A    No.

24   Q    Okay.  Between April 2011 and April 2012, did you

25   observe the plaintiff at the Post?

*Fontaine - Cross*

1    A    Yes.

2    Q    Did you estimate how much time she spent?

3    A    The only time I saw her was durin' the nights, usually

4    on Friday nights.

5         MR. MILLS:  No further questions, your Honor.

6    **CROSS-EXAMINATION BY MR. MORGADO:**

7    Q    Good afternoon, Mr. Fontaine.

8    A    Hi.

9    Q    Between April 2011 and April 2012, is it your testimony

10   that you cannot estimate the number of hours that Miss Prue

11   worked?

12   A    No, I can't.

13   Q    Do you know whether during this time frame we're

14   talking about that the Legion kept records as to how many

15   hours Miss Prue worked?

16   A    I know there was time cards.

17   Q    Okay.  And do you know whether or not there was actual

18   time, as far as how many hours Miss Prue worked during this

19   time frame written down on 'em?

20   A    I wouldn't have access to that.

21   Q    Let me -- between April of 2011 and April of 2012,

22   do you know of any records that exist that memorialize

23   Miss Prue's hours worked?

24   A    Just what I've heard here, ya know, with the time

25   sheets and time cards, that's all I've heard.

*Fontaine - Cross*

1   Q    Absent what you've heard here in court, besides --

2   A    No.

3           THE COURT:  He said just what he heard.

4           MR. MORGADO:  All right.

5           THE COURT:  Anything further?

6           MR. MORGADO:  No, thank you, your Honor.

7           THE COURT:  You may stand down.  Any other

8   witnesses?

9              (Witness was excused.)

10          MR. MILLS:  No.  The defendant will rest, your

11  Honor.

12          THE COURT:  All right.  That concludes any

13  evidence that either party had to submit on behalf of this

14  issue.  I'll give you two weeks to file a letter argument as

15  to what you believe the Court now has in its possession to

16  establish or not establish the overtime hours for the

17  plaintiff and then I'll render a decision after that, okay?

18  Anything further?

19          MR. MILLS:  No, your Honor.

20          MR. MORGADO:  Thank you, your Honor.

21          THE COURT:  Thank you.

22              (This matter adjourned at 3:28 PM.)

23                  - - - - -

24

25

1           CERTIFICATION OF OFFICIAL REPORTER

2

3

4           I, THERESA J. CASAL, RPR, CRR, CSR, Official

5   Realtime Court Reporter, in and for the United States

6   District Court for the Northern District of New York, do

7   hereby certify that pursuant to Section 753, Title 28,

8   United States Code, that the foregoing is a true and correct

9   transcript of the stenographically reported proceedings held

10  in the above-entitled matter and that the transcript page

11  format is in conformance with the regulations of the

12  Judicial Conference of the United States.

13

14          Dated this 30th day of May, 2016.

15

16          **/s/ THERESA J. CASAL**

17          THERESA J. CASAL, RPR, CRR, CSR

18          FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25

*THERESA J. CASAL, RPR, CRR*
*UNITED STATES DISTRICT COURT - NDNY*